I don't really have a whole lot to say in this matter and I don't know that I'll take up 15 minutes so I'll do my bit to get us through here. I see this as a very simple case. Since 1991 when this court handed down Texas faculty it has been very clear that when there is a series of program eliminations at a university that there are two hearings that are required. One for the program. But isn't it actually an oral hearing because it seems to me that if we're going to announce a rule that oral hearings are required for due process and the entire federal courts are being run improperly because a good bit of work of the federal courts is not done with oral hearings. Right. We're not asking for anything. We're asking for it to be considered. It is not disputed that Wilson was not permitted to bring anything related to her tenure to the attention of anybody. All of the process they set forth in their brief and that Judge Walters mentioned related only to the limited program discontinuation. Where did she make any requests to bring her personal situation to the attention of people because there were several public hearings if I'm not mistaken. She attended one and she said nothing. So where did she toot her own horn? She requested and in fact was led to believe that she would be able to appear and deal with her tenure being terminated up until the very end. But you keep talking about appear. I mean she wrote at least five letters to several different people who responded in addition to the committee, in addition to the public meeting that Judge Jones referenced. So your focus seems to be that she never had a chance to make an oral argument and we deny oral argument in a lot of cases and nonetheless feel we've given due process to the parties because we consider their written papers. No. That isn't our argument. Our argument is that she was never permitted and all of these people who in organizations were never allowed to consider the fact that her tenure was being terminated in violation of the bylaws. The fact that there is actually no evidence that this alleged program elimination even took place, that she was not actually tenured to philosophy, her contract, the faculty handbook and the Board of Regents policy specifically stated that tenured professors are tenured to a department. She was tenured to the Department of Communications. She was not tenured to philosophy. Okay. But that's the merits. That's not the process that she got. They were not allowed to consider that. That's my point. In Texas faculty. But they said that they did in fact consider whether there was some other job for her. No. That has nothing to do with whether or not determining her tenure without due process. So you're saying there should have been two sets of hearings? That's what Texas faculty said. That's what Texas faculty said. In that case, the person was tenured to the university. There's not a contention she was tenured to the university here. The broadest would be to the Department of Communication, as I recall. Were there other positions within the department that she would even be eligible to fill? She'd have to be certified to teach in those areas. Wilson, there was no program of philosophy in the first place. Wilson taught courses that were just offered to everybody as philosophy and religion. As every other university in this country pretty much offers philosophy and religion. The removal by the Board of Supervisors of the program or the service area did nothing to remove those courses. Those courses were removed at the request and at the direction of the dependents, casts, and rectors without the approval of the Board of Regents. I think we're going way back in time though, right? Oh no. No, no. Excuse me. My point, I guess the question I have from what you're . . . I wish you'd be a little more precise about what you're arguing because you don't seem to . . . If philosophy was a program, which as I read Judge Walter's opinion is what he principally dealt with, then they did go through all the appropriate hoops and steps to terminate the program of which he thought she was the only member. Is that right or not right? No, that's wrong, Your Honor. They had no idea. But that's what he held, is it not? It's what he held, but this is a no . . . Well, let's just take it once at a time because that's just once at a time. That's what he held. I don't think he even mentions Department of Communication in his opinion. So you're saying that's a gigantic oversight. So you're saying that's, quote, wrong, but if Texas faculty stands for anything, it would appear to stand for the fact that the person who's being terminated gets procedural due process with regard to the program that person is involved in if the program is eliminated and individually, qua, tenured, whatever it is, based on whatever the nature of the tenure contract. So what you're arguing here is that she was entitled to three hearings. Oh, yeah. Yes, sir. Yes, because there was a program or else they were just totally wasting their time to terminate it and claim they were saving money. So . . . and Walter found that was procedurally, properly handled. Then there's the Department of Communication, which Judge Walter didn't deal with, and you have to show us how you raise and preserve that issue. And third, your client seems to think she also demanded or was entitled to some sort of due process on her own.  No, Your Honor. All right. I think the most important thing I really need to bring the Court's attention to is that when Judge Walters made his findings of fact about these various levels of review and approval, he relied on a document that was submitted by the defendants that we refer to as the hearsay document. There was no support in the record for the facts set forth in that. In fact, the record showed the chairman of the SRAC committee testified that the philosophy . . . they never considered the elimination of philosophy. All the contemporaneously created documents, the draft report for this SRAC committee, the final report never mentioned that philosophy was on the chopping block. In other words, our position is this entire set of things that Judge Walters was misled into believing didn't exist. That's a pretty strong accusation. Yes. As a judge who's been on the bench for 35 years as an attorney and so on. And I agree with that, but when they submitted the document, the hearsay document, for which all the evidence in the record contradicts, he believed . . . under Rule 11, he's believing that this represents that there is evidence in the record. There was no evidence in the record. Well, at some point, philosophy was eliminated. So you're trying to say that they did all this program review, at least of something, but not of philosophy? Yes, ma'am. These other areas? Yes, exactly. That was reviewed for a while. And there was input. And then at some point, philosophy just leaps in there at the last minute? Yes, that's exactly right. How did that happen? And how did that happen? We cite to the email that Stephen Richter sent to the president of the university, and he said, these are . . . and this is in my brief. These are the programs that were approved for elimination, but there is no actual evidence that the SRAP committee ever considered removing philosophy. But it was removed? By those two . . . I mean, are they . . . By those two administrators. Let me ask you this. Yes. By those administrators. If I went to that college . . . Yes. . . . in 2010, could I sign up for a philosophy class? No, because what happened then, as soon as Wilson filed her claim with the EEOC, Kasson Richter's contacted Wilson's, the chair of her department, and ordered him to remove all the philosophy and religion courses and have them taken out. That's actually why she had no job there, because they were taken out. But the termination notice was sent before the EEOC claim. Right, but the courses were never removed until she filed with the EEOC, and . . . Okay, but how can they be retaliating by terminating her for something she hasn't yet done? No, they retaliated by taking all the courses. The only explanation they can give as to why she doesn't have a job is the courses were removed. The retaliation is removing the courses, not terminating her. Which caused that . . . well, they don't . . . Because they terminated her in July . . . No, they actually deny terminating her, Your Honor. They say it was because the courses were no longer there. They sent her a letter in July saying, you're out, and in October, she filed the EEOC. Right. And so, in July, they can't be retaliating for something she does in October, okay? So you're saying then what they retaliated for later was to actually remove the classes if they hadn't removed the classes before October. And then they lied about the process that took place. Because had they not lied about the fact that the philosophy . . . there was no . . . it wasn't a program. It was courses people took as extras. It didn't save any money. The idea that cutting philosophy . . . They would have did if they didn't have a tenured professor there anymore. $54,000 and no philosophy or religion at all at the University of Louisiana. Well, is this the only thing they cut? They didn't cut anything else in the entire school? No, they cut more. Okay. But let me also . . . That's how cuts work, is that, you know, one professor gets cut, one staff person gets cut, they stop buying library books. That's how cuts work. Any one library book doesn't cost very much, but if we stop ordering 100 or 200 of them, it does. But that is . . . they don't justify it as a reduction in force. What you're describing is a reduction in force. They said it was a budget cut. But, yeah, but that . . . and that wasn't permissible. Well, the budget of the school . . . The only permissible reason that they give is a program elimination, and the purpose of program elimination, when you say we're not going to have a major in a subject, it means we no longer offer those high-level courses that are poorly enrolled. And that's really how they save money. It's not the dollar-for-dollar of the faculty person's salary, because Wilson, in fact, earned more than twice her salary. You're getting into areas that we as a federal court, according to our opinions, are very reluctant to get into. Now, your claim is either, A, retaliation, or, B, due process. It's both. Your Honor, they stipulated that there was never . . . she was never able to put forth the fact that her tenure was terminated in violation of the U.L. bylaw, which didn't include program elimination as a basis to terminate tenure. It did include financial distress. Well, but it did not say . . . their argument is that where it says cause, and cause is defined as seriously detrimental to the university, that they can read into that program discontinuation. And financial exigency . . . She was tenured to philosophy, and philosophy went away due to budget cuts, and therefore there's nothing for her to be tenured to. She wasn't tenured to philosophy. Okay. No, that's a merits question, though. I'm just saying, their argument is there's nothing to tie her tenure to because philosophy goes away due to budget cuts. They're not saying she did something wrong, and they're hiring her for doing something wrong. Exactly. Exactly. Are you complaining that there wasn't a declaration of financial exigency? That is one of the points. Had there been a declaration of financial exigency, then they would have been authorized to terminate tenure, but they were not. The very next bylaw made clear that tenure could only be terminated in the context of a program elimination if there had been a declaration of financial exigency. They, in fact, later amended it to include that. The most important thing to remember is there is no factual support, and this Court is to review de novo the facts. We set out very clearly that there was no committee that actually reviewed to eliminate philosophy. I will say the reason is that committee was asking for specific evidence of definition of what is a program, and they were demanding information, qualitative information, regarding the student credit hours. That would have shown Wilson was productive and her electives were earning money. I know my time is up. No, you have one minute. I have one minute. I have a question about the statute of limitations, you call it prescription in Louisiana, on the Section 1983 claims. That wasn't raised in their brief, so I'm not as fully up on that since I wasn't able to address it. My understanding is under the law, you have a year from when the actual termination took place, and the actual termination took place in, I think it was October or August 2010, and she filed like in February 2011? Well, it's a one-year statute, it appears, but when it accrues, it seems like that it could be argued it accrues when she was given notice that she was going to be terminated, when she got the final terminal contract. Had they raised that, I would also have been able to cite a case from this court that said it doesn't start until you know for certain that you're going to be terminated, that there's no more thing to happen, because that program discontinuity, assuming it even applied, which it didn't, would have given her a right of three years to, if they brought it back in, so it wouldn't have accrued, moreover, they're in the record. However, in 2011, the provost for the UL system was sending her resume along with others around to see if they could get her a job, and I would have been happy to address that. All right, thank you. Now your time is up. Okay, thank you. Okay. Ms. Clark? Yes, Your Honors. Just a moment. May it please the court, Linda Law Clark on behalf of the State of Louisiana and the defendants and Ms. Moran. The issue here, as Judge Walter raised, is what due process is required when a tenured faculty member at a public university is eliminated. I would assert to you that there are facts that are material that are not in dispute, and that is what Judge Walter was focusing on. They included the stipulations by counsel prior to trial at the record 3823 to 27. The fact that in ULS, tenure is to your discipline, record site 229. That there was a termination list that was non-exclusive, and the policy found at record 95. That there was extensive quantitative and qualitative review from record 313 to 357 of all the different departments, the number of majors, the number of minors, the number of students. Philosophy had neither majors, minors, nor was it a required course. It was an elective. Additionally... Did she have a chance to raise the fact that her overall, you know, whether it's she's tenured to philosophy, tenured to Department of Communications or something else, did she have a chance to have somebody look at that question? Extensively. In the record... That's how it seemed to me, but she feels like she didn't get that chance. Yes. Explain your view of that. The issue was that, in fact, there was a specific process, which is in the record of eight different committees reviewing, and that after that, she was let, was told that the program would be eliminated, was allowed to appeal and appeal to an appeal committee on the program. I absolutely agree with Ms. Morey that she did not appeal her tenure. That's not an issue. If tenure is to a position and the position is gone, tenure doesn't exist. They did not need to terminate tenure because the position was gone. She was deprived of the chance to make the argument that she was tenured to the Department of Communications and not to the program. It's a new issue. Ms. Morey's enrollment in this right before the trial in her sister's case has resulted in her pulling out of many of the things that the trial counsel told the court before this judgment. It included people being dismissed, defendants being dismissed, and claims being dismissed that Judge Walter cites in his record, which she now seems to suggest she disagrees with, including things like the... Are you saying this argument that I was tenured to Department of Communications and not philosophy is new or was waived in some way? Yes. She was a philosophy-tenured faculty member. The record reflected that that's what she received her tenure in and that was examined. I want to apply the cases to those facts and I want to bring your attention to a new case that might be of interest from the Louisiana Supreme Court late 2014. It is a class action by tenured K-12 teachers in New Orleans who lost their jobs because of Katrina. And the court in 14-0329 and 30 found that it would have been absurd to have due process on whether or not teachers in the public schools of Orleans whose buildings were gone, whose teachers lost their tenure and had to have individual hearings. I would also call your attention to Frumpkin, a Sixth Circuit case cited that was also very similar to this, a federally funded program lost its funding, faculty were terminated without additional due process. That Morrissey-Matthews flexible standard of due process and the balancing of interest. The state has a serious interest in trying to keep its institutions open. The state has a serious interest in requiring a balanced budget. Were there all budget cuts where staff gets fired, they stop buying library books, I mean a typical budget cut? Yes, Your Honor. And in fact... She's a victim of that, of the budget cut. In fact, on record 251, it shows that in 2007 that ULM had 180 faculty and in 2014 they were down to 115. It also shows in the record on page 308 that in the arts and science program alone they lost eight positions just in that year, that first year. And this court can take cognizance of... Were some of those tenured? Yes. But she's saying we'll start getting rid of the adjunct people first. And they do. They took care of adjuncts, they took care of tenured and you will see in the record that they continue to in 09, in 10, in 11, in 12 and unfortunately as you can take note of the public records in the newspapers today, about to do it again. More cuts, higher education on the chopping block. Well, it seems like she did bring up this distinction between tenure to the position and to the structural unit in the summary judgment. You're trying to say this was brought up after the hearing, before the district report? But I'm looking at the summary judgment... I believe it was written, I believe it was included in her opposition to our summary judgment that she believed now that she should be in a communications department. But you will also note in that, that state universities are required under the Southern Association of Colleges and Schools to have SACs accredited faculty. The purpose of that is so that those students can have student loans and their degrees will be of value if they go forward in the profession they've chosen. Dr. Wilson was not SACs accredited in anything other than philosophy. And the assertion that the philosophy was taken out in retaliation belays the fact that when philosophy was eliminated and had no majors, no minors and was not required, that those courses would not damage the students, it would be the least blood-letting, so to speak. I would also note that Ms. Morey seems to suggest that certain agreements with the court by former counsel, Mr. Cameron, are not in place. I just want to make sure for the record to let you know that ULM was dismissed because under 17 colon 3351, they're not subject to suit. The board is subject to suit. Further, the 11th amendment is very clear. Ms. Morey, I believe at one point, says we waived it. You don't waive jurisdiction. 1983 claims are very clear. The board is a state agency in the state and any individuals in official capacity are not subject. The sole subject to are Dr. Cass and Dr. Richter. I think the focus here is the due process issue and the retaliation issue. Correct. I mean, I can only speak for myself, so I don't mean to speak for my colleagues. So I don't think that the 11th amendment is going to really be the key thing for her. So to me, I'm back to the issue, now I'm a little bit confused about what process she got. It seemed to me she wrote a letter to everybody and their brother and got responses and then had the appeals process as well as before all of this, there was the public hearing that we heard about and heard saying, I don't want to have a meeting with anybody. And then she started writing letters and everybody responded to these letters and then she had the appeals process. Correct. I guess what I'm trying to understand is, did she in fact have a chance to raise this point that, hey, I'm tenured to something bigger than philosophy, whatever that is. And I therefore should find a job in something other than, you know, let me go teach communications class or whatever else is in this department. In her appeal, in her appeal, she specifically told that committee, hey, you're taking away my tenure. And they said, we are looking at the elimination of philosophy. You're in philosophy. We will look at it. We find that all of these levels that are in the record that reviewed it, recommended it. And let me be clear, the state had to eliminate something. And I thought somebody said that they looked for something else for her. They most certainly did. There are emails they're asking for her to come and then she was not available when she was asked. They asked and looked at multiple times, both Dr. Cass, her department head and Dr. Richter's a provost. And keep in mind, these are two lower level officials. It didn't even stop at them. It goes from them to President Cofer, who is not named. It goes from Dr. Cofer to Dr. Moffitt at the U.L. system. He's not named. It went to the board. And what she names the board for is retaliatory termination, which under the Nassar case clearly doesn't apply because to suggest to this court that she would not have been fired except that she complained about some discrimination belies the fact that there was an entire financial crisis and a committee that determined things had to be cut. And the board approved the cuts. And for all nine universities, right? It absolutely did. It's not like they brought in some other person to teach philosophy. No, ma'am. Okay. There is also another case that was in the Fifth Circuit currently, Jones versus the Board of Supervisors. It is only of interest because it is against the board. It's the same program elimination. It's an economics professor within the system challenging his termination. It's in briefing at this time. It's 14-31255, Judge D. Drell, dismissed on the very same grounds that Judge Walter did saying due process is flexible, balancing interest is important. It would be absurd to have hearings. And I would note that Judge Walter and Judge Drell, should you look at that, said the Texas Faculty Association case is clear. It would be absurd to require major hearings if there's no program. That is the issue. There is no program. Do Your Honors have any questions on her other claims? I mean, I have information in response. Some of her retaliation claims, I know some of the stuff she complained about, she was complaining earlier in the 2000s, but later she files a charge in 2009 after she gets her terminal contract. Now, the things that happened after the charge, it looks like some of those issues are still in dispute as to retaliation for that charge. Now, I don't, it seems to me like the termination decision was already made, so it's hard to say that that was in retaliation for filing that charge. But she did talk about being put on administrative leave. She was. Voluntarily. And then some kind of clandestine meeting at the coffee bean place. Dr. Wilson and . . . She solicited people to file complaints about her threatening them. And Judge Walter did not take that very seriously, but she certainly does assert that. She asserts that it was improper for them to have put her on administrative leave. I want you to understand that the violence in the workplace issue and the concern of safety for an individual and as to others is very critical in any public entity, whether the courts or the universities. There were a multiple number of faculty who felt that they were afraid of Dr. Wilson because of some of the things that she was telling them. It is not a disciplinary action. She was placed on administrative leave and paid the entire time because of that. And once it was determined that there was not a concern and that she, for whatever reason, was calmer and there was less of a threat, she returned. The notice of termination was in 2009. She attempts, I think, to suggest that the 2006 EEOC complaint is the basis, but I'd like to draw your attention to the fact that the record actually reflects that after that she chose not to file suit and the very people, Dr. Cass and Dr. Richter, who she now accuses, recommended her to the full board to be a full professor and she was made a full professor, which I would suggest eliminates the chance of suggesting that they were taking it against her for that. And you are absolutely correct on the prescription issue, Your Honor. We did not raise it in the brief because His Honor did not address it. It was in the summary judgment motion. And in fact, the law is very clear that Louisiana applies a one-year and it applies from when you are noticed that you will terminate, but it is not before Your Honors right now because His Honor chose not to address it because he felt it was dismissible. Actually, can't we refer for anything supported by the record? Yes. And wouldn't that be a basis? It would. It was briefed to the district court. It's not a surprise to either side. Yeah. No, it wasn't. It was briefed fully to His Honor. He didn't rule on it. He didn't rule on it because he dismissed the case. But it's a question of law. We don't need any backing. She was noticed. The record reflects. It stipulated she got her notice in January 22, 2009. She didn't file to January or June of 2011. She was given a terminal contract. I understand that. Back to the coffee bean situation. Yes. Are you claiming this is not a materially adverse action, the administrative leave? Wouldn't that have a chilling effect if people have to leave? No. It is actually established to address the safety and security of all parties. And it's done with both students and faculty at all public universities. It is considered a nondisciplinary action. Is there an issue as to whether this even occurred, how threatening she was, as to whether that was a legitimate move to her? The record reflects their complaints and concerns and their fear of her, including her... It sounds like Richter solicited people to file complaints about her. The coffee shop meeting was a coffee shop across from the administration where several people met and had coffee, and they testified the same. There are, at any given day, going to be people at that coffee shop. The issues regarding her review and her terminations occurred long before that. That also is in the record that she was indicating to people that she thought Dr. Richter's was going to take her and throw her off the top of a building, and that he was concerned that she might come after him if she thought that was true. So we had a lot of things going on, and they were trying to address the realty of it. And they determined that she, at times, didn't seem to have the appropriate demeanor at workplace, but then she calmed down. Who made the decision to put her on administrative leave? Dr. Cofer. With the approval of the Board of Supervisors, not even named. He is not named as a defendant. I'm not sure why, but no, he was not named as a defendant ever, nor was Dr. Moffitt, who is the president of the University of Louisiana System Board process. What about your comments about you did try to find her another job, and one of the things she wanted to be considered for was some kind of graduate person, liaison, or something like that? The Board of Supervisors process is to look at an academic and determine if they're SAC certified to serve in an academic position. The positions she was addressing are administrative. Each of those positions are at-will positions, but they are tied to a tenured position. So an individual who might be a student academic advisor is also tenured in English or in history. In fact, it can be taken away without any cause, but the individual still stays tenured. So there was nothing to tenure her to, to give it to her. So you're saying that she was being considered for this, but then I thought the thought was she didn't get along well with people, so that would be bad, but then she had a review in 2009 earlier that said she was very collegial and got along with everyone. She was, at points. So she changed her . . . Yes, she changed. Some of the information is, some of the information submitted in the pretrial order and exhibits by her former counsel suggested that she had some medical issues and that there were certain psychiatric reports regarding an on-again, off-again. But she is, when on-spot, on-spot. She knows her philosophy. She can teach the classes, but when she's not, she's not. And there was a period of time when she was not. Was there some position available that she was prevented from applying for? No. Okay. And the record reflects that not only did they examine whether or not she could be certified and or teach in the university, but the system office actually sent around to all the other eight schools of the system, there are nine in UL's system, the different, it was not just her, the number of individuals at each school that were tenured and losing their position to see if any of them had a job that she could apply for and be considered. It wouldn't be automatic, but they could consider it. The financial crisis hurt people and is continuing to hurt people, but we suggest that this record is clear. The university system approved a process to do the least damage and cut the budget. They're required to have a balanced budget. They cannot borrow money and something had to be cut and the process and record reflect that unfortunately Dr. Wilson and her position were what we cut. What was the financial exigency declared? There are many reasons why we have not yet and I'm system counsel, I'm one of the system counsels for the system as well, as well as the southern system and LSU systems are looking at it. Financial exigency has far-reaching effect beyond termination of tenured faculty. Many of the universities have bond issues in which they construct facilities and they in fact finance different programs. Financial exigency puts at risk the credit rating of the state and the university. It questions whether or not bond holders can come against that university. It may have to be done, but it doesn't necessarily not have far-reaching implications if done that could be devastating to the system. So they looked instead at looking at specific areas of program focal interest and the PPMs, their rules and bylaws as a total established what they thought was fair, but again I want to suggest to you that if this whole long process had resulted in a faculty group coming up and saying Dr. Cofer, don't cut a thing, we're all going to be here next year. He could not have done that. This was an effort to get input and to have it be a group effort, but something had to be cut. The money was not there. We suggest it was done properly. We suggest Judge Walter is completely correct. We suggest that his decision should be affirmed. Thank you very much. Thank you, Your Honor. Okay, Ms. Moore.  As soon as Wilson filed with the EEOC, the defendant cast sent an email to her chief in her department head and said, hey, I want to talk to you. This is rural record on 650. I want to talk to you about when we decided to can philosophy. I need the emails and dates. And then he throws in this, also, when she yelled at you in the office, did you feel threatened? Do you now? That was November 20th. That, as we explained in our brief, was the beginning of the bogus administrative leave. November 20th of what year? 2009. The secret meeting, off-campus meeting, for which one of those professors committed perjury to cover up Richter's presence at it did not take place until March 2010 when they were trying to resolve the other EEOC case. I feel very . . . I feel my client has been significantly disadvantaged by Ms. Clark's getting up now and giving you specific ROI sites that they did not put in their brief. As I noted, in their brief, rather than comply with this court's Rule 28.2.2, which requires specific sites to the record, they put in huge chunks, 650 here, 350 here. One was 1800. I can't, on my little iPad mini, bring up those and respond to them. I'd request the opportunity to file a surreply . . . You can file a 28-J letter, you know. . . . that addresses more factual, because 28-J is usually about new . . . and, again, the case I was not aware of. We addressed all the claims that they . . . Now, just because she filed a charge and then an email went out to get information about when the decision was made to terminate philosophy, don't you think the university had to respond to the charge? They had to submit a position statement, so it's not unusual to be gathering information in order to do that. Our point is to use it. It is evidence that they were starting to build a case that she was, quote, dangerous. We addressed that in our brief. There was no testimony that she was actually dangerous. They couldn't remember why it was she was . . . they were afraid of her. The fact that the professor felt the need to perjure himself to cover up the fact Richter's was there, is . . . a jury would be able to conclude that they were hiding that fact and that the whole purpose was designed to discredit Wilson. That's a disputed fact. I would . . . the most important fact I would like the Court to realize is there is no evidence in the record to support this idea that all these committees ever considered to remove philosophy. There's a famous quote, if you tell a big enough lie, you can easily get people to believe it, because good people don't believe somebody would lie about something this big. Can you file a motion for reconsideration in the district court? On what basis, Your Honor? On the basis that Judge Walter's entire opinion is founded on a grievous misunderstanding of the fact. No, we did not file a motion to reconsider on that basis. We did bring to his attention all of these things. We brought to his attention in our response to their motion for summary judgment, we pointed out she wasn't . . . there was no program of philosophy. We pointed out that she was . . . and may I address the issue of her being tenured to a department. That is pursuant to a law. It's not a law. It's the policy of the Board of Regents. That is controlling law. I only found out about that and only cited in a reply because I found it should have been brought to our attention. We requested discovery of all policies. They did not bring it to our attention. Well, again, Judge Walter cites the handbook further notes, tenure shall be granted and held only within an academic discipline. Your Honor, that may be, but when it comes to whether you're going to terminate someone for tenure, I mean for financial exigency, her contract specifically tenured her to a department. The faculty handbook specifically stated all faculty hold tenure to a department for purposes of financial exigency. And this was required by the Board of Regents policy on tenure. It said each faculty handbook must provide that they are tenured to a department. They could have declared- Didn't they say an academic structural unit? Yes. The Board of Regents? Yes. That would be, in Wilson's case, it was the department. When they promoted her to tenure, the contract, she was not promoted. The letter from, did not mention philosophy. It never, in her contracts, never mentioned philosophy. She was in a department, and she was- A department of communications? At the end, initially it had been department of history. And then it was communications at the relevant point in time that you're on, but you didn't raise that until your opposition to the motion for a summary judgment. I don't believe that's true. I think we did raise it. I don't know that we raised the Board of Regents policy because we were unaware of it, and they certainly didn't bring it to the attention of the court. The fact that it's in her contract, it's a fact of law that there is, I would also argue a bit of, when she says there is some- Well, you've way over, you've overrun your time, so you've- Please read our brief. Had rebuttal. All of these issues- We've read it. Okay.